FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ SEP 1 7 2010

P.M.
TIME A.M.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                              :

MANNY DAVIS,                     :

             Petitioner,     :

     - against -          :

ROBERT K. WOODS, Superintendent, Upstate  :
Correctional Facility,          :

            Respondent.   :

                              :
-------------------------------------------------------------X

**MEMORANDUM AND ORDER**

05-cv-03414-ENV

VITALIANO, D.J.

     In 2001, petitioner Manny Davis was convicted of numerous charges pertaining to an armed robbery and sentenced to an aggregate prison term of 18 years. In July 2005, Davis filed a timely *pro se* habeas corpus petition pursuant to 28 U.S.C. § 2254 claiming that: (1) he was denied his rights to counsel and to be present at trial when, in petitioner's absence and without making any inquiry of him, the trial court rebuffed his appointed attorney's request to be relieved as defense counsel; (2) he was denied his right to a fair trial when the trial court granted the prosecutor's request for a recess during direct examination of the complaining witness; (3) he was denied his right to a jury of his choice when the trial court dismissed a sworn juror just prior to deliberations; and (4) he was denied the effective assistance of appellate counsel. For the reasons set forth below, habeas relief is denied.

## BACKGROUND

     Early on the morning of June 9, 1999, Melvin Grant and Leonardo Blanco were mugged at gunpoint by two men near the intersection of Northern Boulevard and 100th Street in Queens.

Shortly thereafter, Davis and Gabriel Wheeler were arrested and charged with multiple counts of robbery, criminal weapon possession and stolen property possession.

Davis and Wheeler were tried jointly in Queens County Supreme Court. On the morning of the third day of voir dire, Davis's attorney, Nicole Corrado, and Wheeler's attorney, Andrew Yerrakadu, asked to speak with the court before the defendants were brought into the courtroom. The two attorneys explained that Corrado was experiencing problems with her client. According to Corrado, ever since the outset of her representation of him, it had been difficult to get Davis to communicate with her, and he had been unwilling to listen to her "whenever there ha[d] been any discussions with respect to areas he is not pleased with, whether it is about potential sentence or exposure." (Tr. 298.) Corrado also indicated that she often felt frightened that Davis might try to harm her, and noted that she had moved unsuccessfully to be relieved as his counsel at a preliminary stage in the case for that reason. (Tr. at 297-98.) Earlier on the morning of the informal conference with the court, during a meeting with Davis where Yerrakadu was also present, Davis had made what had sounded to Corrado like threatening statements when she tried to talk about certain legal issues (which she did not identify) with him; specifically, Davis had said that "he had no desire to discuss it; that if [Corrado] continued and persisted, that it would frustrate him, that he was getting frustrated, . . . and he might be liable to do something stupid and he has got far too many other things going on to really care." (Tr. at 299.)

In an effort to alleviate the attorney's safety concerns, the court offered to allow her to meet privately with Davis in the courtroom, with court officers nearby and ready to protect her if necessary, rather than in a holding cell. Corrado continued to insist that she should be relieved because the strained interactions between herself and Davis had resulted in "a serious breakdown in any kind of like [sic] confidence or any type of communication or any kind of attorney/client

relationship." (Tr. at 300.) The court acknowledged that Corrado's concerns were legitimate and serious , but characterized the statements made to her by Davis as "ambiguous words, . . . open to many interpretations," observed that an agitated criminal defendant is hardly a rarity, pointed out that any other attorney who replaced Corrado as Davis's counsel would be in the same position, and told Corrado: "I am sure that there is no way you would let a defendant who is difficult in any way cause you to do less than your very competent ability gives you the facilities to do for your clients." (Tr. 301-02.) Ultimately, after Corrado spent a few more minutes reiterating her views on the record, the court stated that it would not entertain the withdrawal request at that time, as it did not appear that Davis's anger was directed at Corrado personally and she had thus far been "exceptionally vigorous" in her representation of him. (Tr. at 304-05.) The court offered to take all possible measures to create a safe environment for Corrado to continue representing petitioner for the duration of the trial, and she assented. Corrado never renewed her request to be relieved as trial counsel. Davis never moved for new counsel nor ever expressed to the trial court the slightest unhappiness with the representation Corrado was affording him.

At trial, witnesses for the prosecution (including Blanco, but not Grant, who had apparently left the state and was unavailable for trial) testified that, at approximately 3:25 a.m. on June 9, 1999, Grant and Blanco were walking down Northern Boulevard towards Blanco's parked car when Davis and Wheeler approached them and asked for the time and where to find a cab. Wheeler then pulled a chrome-plated handgun out of a plastic shopping bag and pointed it at Blanco. Davis ordered Grant to lie down on the ground and rifled through his pockets, then stood behind Blanco and grabbed valuables from his pockets and a gold chain with a 10-carat ring from around his neck. After ordering Blanco to lie down next to Grant, Wheeler and Davis

3

fled the scene and jumped into a livery cab. However, their getaway plan was promptly foiled when the cabdriver was pulled over for driving erratically. According to police officers at the scene, a plastic shopping bag was recovered from the backseat of the livery cab, in which they found a loaded chrome-plated handgun, Blanco's wallet, several beepers, and a wallet containing identification for someone named Bobby Lopez, who the police later unsuccessfully attempted to locate.[1] Blanco's chain and ring were found hanging around Wheeler's neck. The police swiftly brought Blanco to where Davis and Wheeler were being detained and, after he viewed them, both men were arrested on suspicion of armed robbery.

Under direct examination at trial, Blanco testified that the police had taken him to another location after the robbery, but that he had not recognized anyone other than the officers at that location. He also stated that he did not recognize anyone in the courtroom. The prosecutor immediately asked for a sidebar conference, explained to the court and counsel that Blanco's testimony directly contradicted his prior statements, and requested a recess until the following day as he sought to determine the reasons for the disparities and, in particular, whether Blanco had been intimidated into changing his story. The court granted the request and directed the prosecutor to meet with Blanco during the recess in the presence of another prosecutor who had previously been uninvolved with the trial, which would enable the defense, if it ever became necessary, to obtain an independent description of Blanco's explanation. (Tr. at 744-57.)

The next morning, the prosecution informed the court that Blanco's self-contradictory answers the prior day had been the product of confusion, and that there was no indication that Blanco had changed his story under duress from the defendants or anyone else. Both defendants'

---

[1] Defense counsel initially moved for a mistrial on the ground that the prosecution had failed to turn over prior to trial the "Bobby Lopez" wallet as potential exculpatory evidence. However, defense counsel withdrew the motion after the prosecutor demonstrated that the defense had in fact been made aware of the evidence prior to trial.

4

attorneys then moved for a mistrial with prejudice, which the court denied after giving all parties an opportunity to air their opinions. Citing the guiding principles established by the New York Court of Appeals in People v. Branch, 83 N.Y.2d 663, 634 N.E.2d 966, 612 N.Y.S.2d 365 (1994), the trial court stated that it had discretion to admit the testimony of a prosecution witness after a mid-testimony conference between the prosecutor and the witness, and, in light of the safeguards in place – the ruling out of intimidation, the presence of an independent observer at the mid-testimony conference, and the availability of cross-examination – the court deemed it appropriate to exercise that discretion. The court stated that the defendants' attorneys had "full scope to ask all appropriate and relevant questions," and "whatever room they needed to explore any issues concerning changes in testimony," including what had transpired between Blanco and the prosecution during the recess. (Tr. 768-70.)

Blanco then retook the stand and his direct examination resumed. Blanco now testified that he could no longer remember what the perpetrators looked like but that he would have been able to recognize them right after the mugging, when their images were fresh in his mind, and he acknowledged that he had identified Davis and Wheeler to the police as the perpetrators on the night of the robbery,. (Tr. 774, 780-81.) Blanco was cross-examined at some length by both defense attorneys regarding the overnight improvement in his memory, and Corrado specifically emphasized in her questions to Blanco that he was testifying under oath and under pain of perjury. (Tr. 804-808, 811-813.) Blanco maintained that he had been nervous the prior day, and had not fully understood the questions he had been asked on direct examination.

After the close of the proof, on the morning that the court intended to charge the jury, the court learned that Juror No. 4, Cheryl Zharnest, was dealing with a crisis at home involving her four-year old son, who had been struggling with a severe case of the flu and a high fever for over

a week. Throughout the trial, a babysitter had been watching the sick child during the daytime hours, as neither Zharnest nor her husband had been able to stay home. That morning, the child's pediatrician sent a signed letter to the court indicating that the boy's condition had deteriorated to the point where he required constant attention from a parent, and that it would be medically prudent for Zharnest to care for him and not be sequestered. The court asked Zharnest, on the record, whether she would have trouble deliberating under these circumstances. Zharnest explained that she was extremely worried about her son and had not slept at all the night before, when his fever spiked and he needed steam baths and cold compresses. If his fever spiked again that night, the juror said, she would have to take him to the hospital. Although her husband would also be home, she would not feel comfortable sending him to the hospital alone with a febrile and screaming preschooler. The court concluded that, as Zharnest was sleep-deprived and understandably preoccupied, she would have trouble deliberating and might rush to judgment. (Tr. at 1110-18.) Accordingly, the court opted to discharge her from continued jury service, and replaced her with an alternate. (Tr. at 1122.)

On February 27, 2001, the jury convicted Davis on two counts of first degree and one count of second degree robbery, one count of second degree and two counts of third degree criminal possession of a weapon, and one count of fifth degree criminal possession of stolen property. He was sentenced, as a second violent felony offender, to determinate prison terms of 18 years for each of the first degree robbery counts, 12 years for the second degree robbery count and the second degree weapon count, seven years for one of the third degree weapon counts and one year for the stolen property count, as well as an indeterminate prison term of three and a half to seven years for the remaining third degree weapon count, all to run concurrently.

6

Davis appealed his conviction to the Appellate Division, Second Department. Through newly-assigned appellate counsel, Davis claimed in his brief on appeal that his due process rights had been violated by the trial court's denial of Corrado's request to be relieved, which took place in Davis's absence and without inquiry as to his opinions on the matter, and the court's decision to grant the prosecutor's request for a recess in the middle of the direct examination of Blanco, in the absence of evidence that Blanco had been coerced or intimidated into changing his testimony. In a supplemental appeal brief subsequently filed by counsel, Davis also contended that he was denied his right to a jury of his choice when the trial court dismissed Zharnest on the eve of deliberations based on a mere possibility that she would later become unavailable.

On November 24, 2003, Davis's conviction was affirmed. See People v. Davis, 1 A.D.3d 607, 767 N.Y.S.2d 638 (2d Dep't 2003). The Second Department held that "the trial court did not deprive [Davis] of his right to the effective assistance of counsel by failing to question him about the attorney-client relationship," pointing out that Davis never expressed dissatisfaction with his attorney to the trial court, and further held that the trial court had providently exercised its discretion in granting a recess during Blanco's testimony and dismissing the juror whose child was ill. Id., 1 A.D. 3d at 607-08, 767 N.Y.S.2d at 639. Finally, the appellate court summarily dismissed Davis's "remaining contentions" as "without merit." Id., 1 A.D. 3d at 608, 767 N.Y.S.2d at 639. Petitioner's application for leave to appeal to the Court of Appeals was denied on February 25, 2004. See People v. Davis, 1 N.Y.3d 626, 777 N.Y.S.2d 25 (2004).

On October 4, 2004, Davis filed a *pro se* motion to vacate his conviction pursuant to New York Criminal Procedure Law § 440.10, on the grounds that his trial attorney had a conflict of interest because she had felt threatened by him, and, consequently, that she neglected to: advise him of the legal impact and importance of the trial; discuss with him the pros and cons of

7

testifying in his own defense; consult with him concerning the reasons for and strategic implications of his choice not to testify or the ultimacy of it being his decision; adequately discuss the prosecution's plea offer of an eight-year determinate sentence and warn against his refusal to accept it; or pursue Blanco's identification testimony in the manner in which a seasoned trial attorney should have. Davis further contended that, had Corrado sufficiently investigated and questioned Blanco about his testimony, "she would have been able to effectively determine why this same evidence was not properly analyzed, or what part it could have played in the robbery, and [Davis's] actual innocence . . . . [A] strong probability exists in relation to the numerous points of evidence presented at trial in favor of [Davis], that another perpetrator of the crime in question existed that was not brought forth before or at trial who should have been identified." (§ 440.10 Motion (Resp. Decl. Ex. H) at 3-4.) As documentation in support of his motion to vacate his conviction, Davis attached an affidavit which he had requested from Corrado in which she outlined the main issues that she had attempted to show in line with the theory of petitioner's defense at trial. The overarching theme of that defense, apparently, was that Davis was the victim of mistaken identification. The police, so the theory went, apprehended the wrong individual, the complaining witness could not identify petitioner in court, the police paperwork did not accurately describe petitioner, petitioner was not physically in possession of stolen property when he was arrested, the follow-up police investigation was minimal and did not include any fingerprint testing of the allegedly stolen property or weapon, the police did not follow up to try to find any other possible eyewitnesses or suspects, and there were numerous inconsistencies in the testimony adduced by the prosecution as to the incident, petitioner's physical description and the events that occurred leading up to and immediately after his arrest.

Davis's § 440.10 motion was denied nonetheless on the grounds that he had previously

asserted an ineffective assistance of trial counsel claim on direct appeal which had been rejected

on the merits by the Second Department, and therefore the claim was procedurally barred on

collateral review. See People v. Davis, Ind. No. 1576/99, slip op. (Queens County Sup. Ct. Dec.

2, 2004) (Resp. Decl. Ex. K). Davis's application for leave to appeal the denial of the § 440.10

motion was subsequently denied. See People v. Davis, No. 2004-11211 (App. Div. 2d Dep't

May 11, 2005) (Resp. Decl. Ex. L).

On January 17, 2005, Davis filed a *pro se* motion for a writ of error coram nobis in the

Second Department, arguing that his appellate counsel had provided ineffective assistance by

failing to raise on direct appeal a claim that trial counsel had been ineffective and a claim that the

prosecution withheld exculpatory evidence from the defense in violation of Brady v. Maryland,

373 U.S. 83, 83 S. Ct. 1194 (1963). On April 18, 2005, the Second Department denied the

coram nobis motion, finding that petitioner had failed to establish that he had been denied the

effective assistance of appellate counsel. See People v. Davis, 17 A.D.3d 606, 792 N.Y.S.2d 847

(2d Dep't 2005). Petitioner did not seek leave to appeal that denial to the Court of Appeals, and

filed the instant petition on July 8, 2005.

## STANDARD OF REVIEW

### A. AEDPA Review

This petition is subject to the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), which provides that a federal writ of habeas corpus may not be granted to a state

prisoner with respect to any claim that was adjudicated on the merits by a state court unless the

decision was: (1) "contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an

unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d); see Gutierrez v. McGinnis, 389 F.3d 300, 304 (2d Cir. 2004) (describing this standard as "AEDPA deference"); Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000) (O'Connor, J., for the Court, Part II) (under AEDPA, habeas relief is only available if "the state court arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decide[d] a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." (citation omitted)).

In the AEDPA context, the term "clearly established federal law" is construed as "'refer[ring] to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'" Carey v. Musladin, 549 U.S. 70, 74, 127 S. Ct. 649, 653 (2006) (quoting Williams, 529 U.S. at 412, 120 S. Ct. at 1523). Further, to be "clearly established" under AEDPA, federal law must be "law that is 'dictated by [Supreme Court] precedent existing at the time the defendant's conviction became final.'" McKinney v. Artuz, 326 F.3d 87, 96 (2d Cir. 2003) (citation omitted). "[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently." Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001). The state court's "unreasonable application" of law must have been more than "incorrect or erroneous"; it must have been "objectively unreasonable." Sellan v. Kuhlman, 261 F.3d 303, 315 (2d Cir. 2001) (internal quotation marks omitted); see Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (to be deemed "unreasonable," the state court's application of federal law must involve "[s]ome increment of incorrectness beyond error"). In addition, under AEDPA, "a state court's findings of fact are 'presumed to be correct' unless rebutted 'by clear and convincing evidence.'" Drake v. Portuondo, 553 F.3d 230, 239 (2d Cir. 2009) (quoting 28 U.S.C. § 2254(e)(1)).

## B. **Exhaustion and Procedural Default**

Pursuant to 28 U.S.C. § 2254(b)(1), "[b]efore seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies" in order to "giv[e] the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Baldwin v. Reese, 541 U.S. 27, 29, 124 S. Ct. 1347, 1349 (2004) (internal quotation marks and citations omitted). "To provide the State with the necessary opportunity, the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." Id. (internal quotation marks and citations omitted). An unexhausted claim that can no longer be exhausted is deemed procedurally defaulted. See Aparicio, 269 F.3d at 90 ("[W]hen 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' federal habeas courts also must deem the claims procedurally defaulted.") (quoting Coleman v. Thompson, 501 U.S. 722, 735 n.1, 111 S. Ct. 2546, 2557 n.1 (1991)).

A claim that has been procedurally defaulted in state court generally cannot be reviewed on the merits by a federal habeas court. See Harris v. Reed, 489 U.S. 255, 260-62, 109 S. Ct. 1038, 1042 (1989) (explaining rationale for habeas corpus procedural default rule); see also Coleman, 501 U.S. at 750, 111 S. Ct. at 2565 (noting a state's interest in "channeling the resolution of claims to the most appropriate forum, in finality, and in having an opportunity to correct its own errors"). However, there are two circumstances in which a federal claim that has been procedurally defaulted, or deemed procedurally defaulted due to the exhaustion requirement, will nonetheless be reviewable by a habeas court. First, a petitioner is entitled to review of a procedurally defaulted claim if he can show "cause for the default and actual

11

prejudice as a result of the alleged violation of federal law." Coleman, 501 U.S. at 750, 111 S. Ct. at 2565; see Teague v. Lane, 489 U.S. 288, 298, 109 S. Ct. 1060, 1068 (1989). Cause is defined as "some objective factor external to the defense" that impeded the petitioner's efforts to raise the claim. McCleskey v. Zant, 499 U.S. 467, 493, 111 S. Ct. 1454, 1470 (1991) (internal quotation marks and citation omitted); see Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994). To show prejudice, a petitioner must demonstrate that the alleged error worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Torres v. Senkowski, 316 F.3d 147, 152 (2d Cir. 2003) (internal quotation marks omitted).

Second, if the petitioner is unable to show cause and prejudice, his procedural default may nonetheless be excused if he or she can show that a fundamental miscarriage of justice would result from a failure to hear the claim on the merits, i.e., "that he is actually innocent of the crime for which he has been convicted." Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (citing Schlup v. Delo, 513 U.S. 298, 321, 115 S. Ct. 851, 864 (1995)). This ground for excusing procedural default should be applied only in "extraordinary" cases, as courts deem substantial claims of actual innocence "extremely rare." Schlup, 513 U.S. at 321-22, 115 S. Ct. at 864.

## DISCUSSION

### A. Denial of Trial Counsel's Request to Be Relieved

Petitioner claims, as he did on direct appeal, that he was deprived of his rights to counsel and to be present by the circumstances of the trial court's denial of his counsel's request to withdraw. The Second Department rejected this claim on the merits. See Davis, 1 A.D.3d at 607-08, 767 N.Y.S.2d at 639, lv. denied, 1 N.Y.3d at 626, 777 N.Y.S.2d at 25. Respondent concedes that petitioner has exhausted his state remedies with respect to this claim.

Davis, it is uncontested, never voiced dissatisfaction with Corrado, or sought the appointment of new counsel; during the pendency of his trial, the only record evidence of attorney-client tension is Corrado's explanation to the court during the jury selection process that she felt petitioner had behaved in a recalcitrant and threatening manner towards her.[2] After considering the concerns Corrado brought to its attention at an informal conference requested by defense counsel, the trial court concluded that substitution of defense counsel at that late juncture was not warranted, that it would not eliminate the threat to successor counsel, and that the better approach was to take measures to allay any subjective fears that might impede Corrado from adequately representing petitioner. Corrado never broached the issue of feeling threatened by petitioner again, and over the course of the ensuing trial, she duly raised objections, made motions, conducted cross-examination and delivered opening and closing statements on his behalf. At no point during the trial did Davis express to the court dissatisfaction with Corrado, much less seek the appointment of new counsel. Nonetheless, petitioner argues that Corrado's acknowledged fearfulness of him created a pervasive and severe conflict of interest between client and lawyer which precluded her from effectively representing him at trial, and that the trial court erred in not consulting or alerting petitioner before denying Corrado's informal request to withdraw from representing him.

On direct appeal, the Second Department found that the trial court's rejection of Corrado's request to withdraw without first asking petitioner how he felt about their attorney-client relationship did not amount to a deprivation of petitioner's right to effective assistance of counsel. Applying AEDPA deference, the Court finds this to be neither contrary to nor an unreasonable application of clearly established federal law. It is well-settled that "[t]he Sixth

---

[2] But it was the second time during the pendency of the prosecution that Corrado sought to be relieved on that ground. The earlier request had been denied.

Amendment guarantees a criminal defendant an effective advocate, not necessarily the advocate of his or her choosing." United States v. Jones, 381 F.3d 114, 119 (2d Cir. 2004). Moreover, the Supreme Court has held that the Sixth Amendment does not guarantee a "meaningful relationship" between defendant and counsel. See Morris v. Slappy, 461 U.S. 1, 13-14, 103 S. Ct. 1610, 1617 (1983). "Because the right to counsel of one's choice is not absolute, a trial court may require a defendant to proceed to trial with counsel not of defendant's choosing; although it may not compel defendant to proceed with incompetent counsel." United States v. Schmidt, 105 F.3d 82, 89 (2d Cir. 1997). To be sure, "[w]here a defendant 'voices a seemingly substantial claim about counsel, the court should inquire into the reasons for dissatisfaction.'" Jennings v. Strack, No. 93-cv-1681, 1994 WL 163944, at *8 (S.D.N.Y. Apr. 25, 1994) (quoting McKee v. Harris, 649 F.2d 927, 933 (2d Cir. 1981)). Here, however, the defendant never voiced any dissatisfaction with his counsel at all.[3]

Without a peep of complaint from Davis, the only facts before the court were Corrado's subjective fear of harm from her client and that Davis was unhappy and uncooperative with her defense strategy in an obviously difficult case for the defense. But the fact that Corrado at times felt physically threatened by her client is not sufficient to establish conflict of interest or good cause for her replacement as petitioner's counsel. Accord, e.g., King v. Rowland, 977 F.2d 1354, 1357 (9th Cir. 1991) (holding that trial court did not err in failing to declare a mistrial based on conflict of interest after defendant had attacked his attorney in open court on the grounds that, inter alia, there was "no indication in the record that the strained relationship

---

[3] Even assuming that petitioner had requested new counsel to replace Corrado, such a request could have been granted only if petitioner had demonstrated "good cause, such as conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict." United States v. Calabro, 467 F.2d 973, 986 (2d Cir. 1972). "Petitioner's request [for new counsel] alone may not substitute for good cause." Byas v. Keane, No. 97-cv-2789, 1999 WL 608787, at *10 (S.D.N.Y. Aug. 12, 1999).

between [the defendant] and [his attorney] prevented [the attorney] from doing his job properly"). Petitioner emphasizes that Corrado herself, in support of her unsuccessful request to withdraw, declared to the trial court her perception that there had been "a serious breakdown in . . . confidence or . . . communication or . . . an attorney/client relationship" between her and Davis. (Tr. at 300.) However, after inquiring, the trial court disagreed with Corrado's assessment and found instead that petitioner's behavior towards Corrado merely evinced his frustration with the sticky predicament in which he found himself, not hostility or menace towards her in particular. On habeas review, this finding of fact is "presumed to be correct," and petitioner has not provided the "clear and convincing evidence" necessary to rebut that presumption. 28 U.S.C. § 2254(e)(1)).

Post-conviction, of course, Davis sings a different tune. The Court notes that, in his habeas petition, petitioner seemingly seeks to demonstrate the existence of a crippling conflict of interest between himself and Corrado by arguing that her representation of him at trial was shoddy – more particularly, that her performance was so categorically deficient that it fell below the familiar standard of "reasonably effective assistance" of counsel set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). Specifically, petitioner argues, *inter alia*, that Corrado did not advise him of the legal impact and importance of the trial, provide him with sufficient guidance about his right to testify in his own defense, warn him of the risks of refusing the state's plea offer, or adequately cross-examine and investigate Blanco. In his *pro se* § 440.10 motion, petitioner asserted an ineffective assistance of trial counsel claim based on essentially identical allegations. Although the direct appeal brief filed by petitioner's appellate counsel had also stated a claim of ineffective assistance of trial counsel, the only basis for the claim identified at that point was that Corrado's avowed fear of petitioner proved *ipso*

15

*facto* that a conflict of interest existed which the trial court improperly ignored. But, the §

440.10 court found that, because the issue of the effectiveness of petitioner's trial counsel had

been raised on direct appeal and decided by the Second Department, petitioner was precluded

from raising additional grounds for the same claim on collateral appeal. See N.Y. Crim. Proc.

Law § 440.10(2)(c).

Accordingly, to the extent the petition seeks relief on the basis of his trial counsel's

alleged violation of Strickland on the allegations first asserted in the § 440.10 motion, such a

claim is procedurally defaulted and barred from federal habeas review, see, e.g., Aparicio, 269

F.3d at 92-93, Reyes v. Keane, 118 F.3d 136, 139-40 (2d Cir. 1997), unless petitioner can

demonstrate cause and prejudice for the default or that failure to consider the claim will result in

a fundamental miscarriage of justice. See Coleman, 501 U.S. at 750, 111 S. Ct. at 2565. Davis

has made no attempt to argue the applicability of either exception, and, more importantly, there

is no evidence in the record before the Court to support such an argument. Although petitioner

claims that he received ineffective assistance of appellate counsel due to, *inter alia*, the latter's

failure to assert Corrado's Strickland violations as grounds for appeal, his ineffective assistance

of appellate counsel is itself unexhausted and procedurally defaulted, see infra, and thus cannot

establish cause for procedural default on another claim. See Edwards v. Carpenter, 529 U.S.

446, 453, 120 S. Ct. 1587, 1592 (2000) ("[A]n ineffective-assistance-of-counsel claim asserted

as cause for the procedural default of another claim can itself be procedurally defaulted);

DiSimone v. Phillips, 461 F.3d 181, 191 (2d Cir. 2006) (stating that an ineffective assistance of

counsel claim "must be presented to the state courts as an independent claim before it may be

used to establish cause for a procedural default"). As there is no appreciable basis to find cause

for petitioner's procedural default, the Court need not even reach prejudice. See <u>Stepney v.</u> <u>Lopes</u>, 760 F.2d 40, 45 (2d Cir. 1985).

With respect to a fundamental miscarriage of justice, the petition does contain an oblique reference to petitioner's "actual innocence" in the context of his allegations of ineffective assistance of trial counsel, but it is unclear to the Court whether that is intended to be a factual disclaimer of guilt or whether petitioner is merely postulating that additional evidence could have created a reasonable doubt in the minds of the jurors and foreclosed his conviction. The Supreme Court has emphasized that the "miscarriage of justice exception is concerned with actual as compared to legal innocence." <u>Calderon v. Thompson</u>, 523 U.S. 538, 559, 118 S. Ct. 1489, 1502 (1998) (quoting <u>Sawyer v. Whitley</u>, 505 U.S. 333, 339, 112 S. Ct. 2514, 2519 (1992)). Even assuming that petitioner does seek to assert actual innocence, that can be shown only by "new reliable evidence," which is nonexistent here. <u>Doe v. Menefee</u>, 391 F.3d 147, 161 (2d Cir. 2004); <u>see</u> <u>Taylor v. Pool</u>, No. 07-cv-6318, 2009 WL 2634724, at *18 (S.D.N.Y. Aug. 27, 2009) (petitioner's own views as to what inferences should have been drawn by the jury and what actually occurred insufficient to constitute a showing of "actual innocence").

In any event, even if the Court could somehow discern a basis to find that petitioner's enhanced <u>Strickland</u> claim is not defaulted, that would be inconsequential because its merits are "easily resolvable against" him. <u>Lambrix v. Singletary</u>, 520 U.S. 518, 525, 117 S. Ct. 1517, 1523 (1997); <u>see generally</u> <u>Dunham v. Travis</u>, 313 F.3d 724, 729-30 (2d Cir. 2002). Under <u>Strickland</u>, to establish ineffective assistance of counsel, a habeas petitioner must "(1) demonstrate that his counsel's performance fell below an objective standard of reasonableness in light of prevailing professional norms; and (2) affirmatively prove prejudice arising from counsel's allegedly deficient representation." <u>Carrion v. Smith</u>, 549 F.3d 583, 588 (2d Cir. 2008)

(quoting <u>United States v. Cohen</u>, 427 F.3d 164, 167 (2d Cir. 2005)) (internal quotation marks omitted). To successfully establish the performance prong of <u>Strickland</u>, a habeas petitioner must overcome "a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance," <u>Brown v. Greene</u>, 577 F.3d 107, 110 (2d Cir. 2009) (internal quotation marks omitted), with a showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Strickland</u>, 466 U.S. at 687, 104 S. Ct. at 2064. To successfully establish the "prejudice" prong, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u>, 466 U.S. at 694, 104 S. Ct. at 2068.

Petitioner cannot make either of the requisite <u>Strickland</u> showings with respect to his trial counsel. As an initial matter, based on the record before the Court, it is apparent that Corrado vigorously pursued a strategy of poking holes in the prosecution's identification of petitioner as one of the robbers and emphasizing the possibility that the true perpetrator was someone else who the police never bothered to try to find, which is exactly what petitioner contends that she did not do. More importantly, Corrado's decisions regarding which questions to ask and not to ask on cross-examination, and which potentially exculpatory leads to pursue and not to pursue, fall within the ambit of trial strategy decisions which, if reasonable, cannot be a basis for an ineffective assistance claim, even if the petitioner disagreed with them contemporaneously or with the benefit of hindsight. <u>See Strickland</u>, 466 U.S. at 690-91, 104 S. Ct. at 2066 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations

18

on investigation."); United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1983) ("Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are [ ] strategic in nature."). Counsel's actions or omissions fall outside the range of reasonableness only if they "cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness," Eze v. Senkowski, 321 F.3d 110, 112 (2d Cir. 2003), and there is simply no indication of that in the record before this Court.

Petitioner's assertions that Corrado never spoke to him about his right to testify and did not advise him regarding the significance and potential impact of the charges against him are likewise unsubstantiated, and thus insufficient to overcome the presumption that she provided reasonable professional assistance. See, e.g., Montgomery v. Wood, No. 04-cv-6474, 2010 WL 3001603, at *14 (W.D.N.Y. July 30, 2010) (petitioner's conclusory assertions that counsel failed to consult with petitioner prior to trial or discuss with him the advisability of testifying did not support Strickland claim). Moreover, they are contradicted by the record that Corrado repeatedly asked the trial court to permit more time and opportunities to communicate with her client. With respect to the plea offer, petitioner's complaint is not that Corrado did not fulfill her obligation to inform him of it; rather, he contends that, after he made up his mind to refuse the bargain and roll the dice at trial, she should have tried harder to talk him out of his decision. However, petitioner makes no effort to dispute that, as Corrado told the trial court, he was frequently unwilling to listen to her advice on important aspects of his defense which he found unpalatable or upsetting to confront.

In any case, even if petitioner could demonstrate that Corrado's performance was objectively subpar, he has not made any showing of prejudice. Petitioner speculates that additional cross-examination and investigation by Corrado would have turned up exculpatory

evidence and prevented his conviction, but does not explain how or why. He further declares that there is a "strong probability" that someone else who was never caught committed the crime, but again, does not hint at who that someone else might have been or how a search should have been conducted. He certainly does not contend that Corrado ever failed to follow up on any defense suggestion he made to her. Additionally, he does not allege that any other consultations with Corrado would have convinced him to accept his plea offer or take the stand at trial. See, e.g., Hill v. Lockhart, 474 U.S. 52, 60, 106 S. Ct. 366, 371 (1985) (petitioner's allegation that counsel gave erroneous advice as to petitioner's eligibility for parole under plea bargain was insufficient to support claim of ineffective assistance because petitioner alleged no facts that would suggest prejudice, such as significant effect of counsel's advice on petitioner's decision to plead guilty). Thus, there is no basis to find "a reasonable probability that . . . the result of the proceeding would have been different" if Corrado had acted any differently. Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

Finally, the Court rejects petitioner's claim that he had a constitutional right to be present in the courtroom when the trial court informally addressed Corrado's application to be relieved as defense counsel. "The Due Process Clause and the Confrontation Clause of the Sixth Amendment, as applied to the States via the Fourteenth Amendment, both guarantee to a criminal defendant . . . the 'right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings.'" Tennessee v. Lane, 541 U.S. 509, 523, 124 S. Ct. 1978, 1988 (2004) (quoting Faretta v. California, 422 U.S. 806, 819 n.15, 95 S. Ct. 2525, 2533 n.15 (1975)); see also Rushen v. Spain, 464 U.S. 114, 138-39, 104 S. Ct. 453, 466 (1983). Although the constitutional right to be present is rooted in the Sixth Amendment Confrontation Clause, the Supreme Court has "recognized that this right is protected by the Due Process Clause

in some situations where the defendant is not actually confronting witnesses or evidence against him." United States v. Gagnon, 470 U.S. 522, 526, 105 S. Ct. 1482, 1484 (1985). A defendant's due process right to be present at a proceeding exists "to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." Id., 470 U.S. at 526, 105 S. Ct. at 1484 (quoting Snyder v. Massachusetts, 291 U.S. 97, 105-06, 54 S. Ct. 330, 332-33 (1934)); see also Kentucky v. Stincer, 482 U.S. 730, 745, 107 S. Ct. 2658 (1987) (same); Cohen v. Senkowski, 290 F.3d 485, 489 (2d Cir. 2002) ("[T]here is no constitutional right to be present 'when presence would be useless, or the benefit but a shadow.'") (quoting Snyder, 291 U.S. at 106-07, 54 S. Ct. at 332); United States v. Canady, 126 F.3d 352, 360 (2d Cir. 1997) (same). "[T]he fact that a stage in the proceeding is critical to the outcome of a trial may be relevant to due process concerns. . . . [H]owever, the question is not simply whether, 'but for' the outcome of the proceeding, the defendant would have avoided conviction, but whether the defendant's presence at the proceeding would have contributed to the defendant's opportunity to defend himself against the charges." Stincer, 482 U.S. at 744 n.17, 107 S. Ct. at 2667 n.17.

Plainly, petitioner's assigned counsel's request to be relieved had nothing to do with the witnesses or other evidence supporting the charges on which petitioner was about to stand trial, or to any ruling or determination that the trial court would make with respect to the charges or the evidence or the conduct of the actual trial. It solely concerned his attorney's subjective concerns about petitioner's volatility and unresponsiveness in the days leading up to the trial, and her belief that he posed a physical threat to her. At the conference on Corrado's request, the trial court weighed the concerns communicated by her and decided to implement security measures to address those concerns and enable Corrado to do her job as defense counsel. Corrado ultimately acquiesced in the trial court's solution and never again informally pressed the concerns she had

brought to the court's attention or ever actually moved formally at any time during the trial to withdraw as petitioner's counsel. Petitioner fails, moreover, to demonstrate that this resolution was unjust in any way, or that his presence would have improved the fairness of the proceeding or his ability to defend against the charges. On the contrary, his presence would almost certainly have either constrained Corrado's candidness about the status of their attorney-client relationship (and, concomitantly, the court's ability to craft an effective solution) and, most certainly, would have damaged that relationship perhaps beyond repair, neither of which would have contributed in the least to petitioner's ability to defend himself at a trial. At the conclusion of the court's informal conference with defense counsel, the status of the trial and the relationship between Corrado and Davis remained unchanged. And, through the end of trial, that status never engendered a whiff of dissatisfaction from Davis.

Consequently, petitioner's claim for habeas relief based on the trial court's consideration in his absence of his attorney's informal request to withdraw as counsel is denied.

## B. Grant of Mid-Testimony Recess Requested by Prosecution

Petitioner's second claim for habeas relief is that he was denied a fair trial when the court granted, over the objections of attorneys for both defendants, the prosecutor's request for a recess during direct examination of Blanco, the complaining witness, in the absence of evidence that Blanco had been coerced or intimidated into changing his testimony. Respondent concedes that petitioner has exhausted his state remedies with respect to this claim as well. The Second Department deemed the trial court's grant of the recess a "provident[ ] exercise[ ] of its discretion." Davis, 1 A.D.3d at 608, 767 N.Y.S.2d at 639, lv. denied, 1 N.Y.3d at 626, 777 N.Y.S.2d at 25. Applying AEDPA deference, the Court again finds that the state court ruling was neither contrary to nor an unreasonable application of clearly established federal law.

Stated plainly, there is no constitutional prohibition on a trial court's decision to grant a mid-testimony recess during the testimony of a prosecution witness. See Del Pilar v. Philips, No. 03-cv-8636, 2004 WL 1627220, at *16-*17 (S.D.N.Y. July 21, 2004) (collecting cases). Likewise, there is no such blanket rule in New York state law. Rather, as was noted on the record during petitioner's trial, New York's high court has explicitly held that, where appropriate safeguards are in place, the decision of a trial court to grant a recess and allow a conference to occur between a lawyer and a testifying witness "falls within the broad discretion allowed a trial court in its management of trial." See Branch, 83 N.Y.2d at 667, 634 N.E.2d at 968, 612 N.Y.S.2d at 367. As described above, the trial court here specifically endeavored to adhere to the guidelines set forth in Branch when it decided to allow Blanco to continue testifying after the recess, and the Second Department found that the trial court had done so without error.

Putting that aside, even where evidence was admitted against a defendant in violation of state and/or federal law, it "does not amount to a violation of due process unless the evidence is so extremely unfair that its admission violates fundamental conceptions of justice. . . . [T]he item must have been sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (internal quotation marks and citation omitted). On direct appeal, the Second Department rejected petitioner's claim that the admission of Blanco's post-recess testimony deprived him of his due process right to a fair trial. Under AEDPA, this Court must not assess the materiality of Blanco's post-recess testimony *de novo*; instead, the proper inquiry is whether the Second Department's conclusion was "objectively unreasonable." Del Pilar, 2004 WL 1627220, at *13 (quoting Jones v. Stinson, 229 F.3d 112, 119-20 (2d Cir. 2000)).

23

The trial record is replete with evidence and testimony from witnesses other than Blanco that, minutes after an armed robbery took place, petitioner and his co-defendant were pulled over in a cab speeding away from the vicinity of the crime and, in the back seat of the cab, the police found property belonging to the victims and a loaded gun matching the description of the robbery weapon. Further, to the extent that there were inconsistencies in Blanco's trial testimony before and after the recess, the defense was given an unfettered opportunity to highlight those inconsistencies and undermine Blanco's credibility on cross-examination. Finally, the specter of intimidation was only mentioned by the prosecution at sidebar, out of earshot of the jury, and later rejected on the record; in the eyes of the jurors, the defendants were never tainted by suspicion of witness tampering. Under these circumstances, the Court cannot say that it was objectively unreasonable for the Second Department to affirm the evidentiary ruling regarding the admissibility of Blanco's testimony. Thus, petitioner's claim for habeas relief based on the trial court's grant of a recess during the complaining witness's testimony is also denied.

## C. Dismissal of Juror

As the third basis for his habeas petition, Davis asserts that he "was denied a trial by a jury of his choice when, on the last day of trial, the court discharged a juror who strongly desired to continue serving because of the mere possibility that she might become temporarily unavailable." (Pet. at ¶ 10.) This claim is undisputedly exhausted as well. The Second Department held that "the trial court, after making a 'reasonably thorough inquiry' into the matter, providently exercised its discretion in discharging a sworn juror on the ground that she was unavailable for continued service." Davis, 1 A.D.3d at 608, 767 N.Y.S.2d at 639, lv. denied, 1 N.Y.3d at 626, 777 N.Y.S.2d at 25 (quoting N.Y. Crim. Proc. Law § 270.30(2)(a)). In light of the relevant facts, petitioner's claim regarding the replacement of juror Zharnest does not

implicate a constitutional concern, and accordingly, this claim is not appropriate grounds for habeas relief. See Wheeler v. Philips, 2006 WL 2357973, at *6 (Aug. 15, 2006) (considering identical claim by Davis's co-defendant in his own habeas petition that the trial court in their case improperly dismissed Zharnest) (citing Jones v. Greiner, No. 01-cv-5276, 2003 WL 22284142, at *13 (E.D.N.Y. Aug. 18, 2003) ("The decision to replace two jurors who would have delayed the trial does not raise a federal constitutional claim."); Cabassa v. Filion, No. 03-cv-2920, 2004 WL 1367503, at *7-8 (S.D.N.Y. June 16, 2004) (holding that dismissal of ill juror did not violate Sixth Amendment); McCrary v. Artuz, No. 95-cv-622, 1995 WL 728423, at *4 (E.D.N.Y. Nov. 28, 1995) (holding that discharge of an ill juror did not implicate constitutional concerns)). "[T]here is no allegation that the replacement juror[ ] was biased, or that [any other] constitutional infirmity ensued as a result of the trial court's decision. In the absence of any such claim of prejudice, no constitutional concern is implicated and no basis for habeas relief exists." Wheeler, 2006 WL 2357973, at *6.

Moreover, to the extent petitioner argues that his due process rights were violated by the trial court's failure to comply with state procedural law or that its decision to discharge Zharnest was based on "an unreasonable determination of the facts," his claim is patently lacking in merit. See id. Under New York law, a trial court must dismiss a juror who is "unable to continue serving by reason of illness, other incapacity, or for any other reason is unavailable for continued service," N.Y. Crim. Proc. Law § 270.35(1). For example, inability to be sequestered may render a juror unavailable for continued service. See People v. Warwick, 239 A.D.2d 124, 125, 657 N.Y.S.2d 602. 603 (1st Dep't 1997). Prior to dismissing a juror on unavailability grounds, the trial judge is required to "make a reasonably thorough inquiry concerning such illness [or] incapacity[.]" N.Y. Crim. Proc. Law § 270.35(2). Ultimately, whether a juror is unable to

continue serving is trusted to the sound discretion of the trial court. See Morales v. Strack, 99-cv-1617, 2003 WL 21816963, at *5 (E.D.N.Y. July 3, 2003); People v. Settles, 28 A.D.3d 591, 591, 813 N.Y.S.2d 501, 502 (2d Dep't 2006); People v. McDonald, 143 A.D.2d 1050, 1051, 533 N.Y.S.2d 894, 895 (2d Dep't 1988) ("The standard for determining when to substitute an alternate juror for a sworn juror pursuant to § 270.35 is a flexible one and the decision of whether a juror is unable to continue serving is left to the trial court's broad discretion.").

Here, just before the case was submitted to the jury, the trial court was presented with a doctor's note stating that Zharnest's four-year-old child was suffering from "a severe illness which requires [her] constant attention and it would be medically prudent for her to be with him and not to be sequestered in a jury situation." (Tr. at 1107.) The trial court's law clerk, at the trial court's request, followed up with the doctor, who explained that the situation was not a bona fide emergency but the child was medically in sufficiently bad shape to require constant care from someone other than a babysitter, preferably a parent. The court then summoned Zharnest and inquired further about the situation and potential solutions. Juror Zharnest stated that she did want to deliberate and see the case through to the end, but that unless she could be sure at all times that her son's condition was stable, she would be too preoccupied and worried about him to concentrate. Additionally, Zharnest indicated that she was very nervous about her son's fever spiking at night, which had become a pattern; she had barely slept during the two prior nights, and if the fever spiked again that coming night, she was determined to take him to the hospital. Although her husband was available to help out, Zharnest said that he was not equipped to handle that on his own. The court observed that there was no way to predict if deliberations would be over by the end of that day and sequestration was mandatory under state law, so Zharnest might rush to judgment in order to finish before nightfall. Further, if deliberations did

go long and the child's condition deteriorated again that night, which could reasonably be expected, Zharnest would have to leave to bring him to the hospital. Given these circumstances, the trial court's decision to discharge Zharnest and substitute an alternate was well-supported and could not be deemed an abuse of discretion by any standard.

Because petitioner's claim that the trial court improperly dismissed Zharnest prior to deliberations does not implicate a federal constitutional right and lacks any cognizable basis in law, fact or logic, it is rejected.

## D. Ineffective Assistance of Appellate Counsel

As the last string to his bow, petitioner asserts that he was denied the effective assistance of appellate counsel because appellate counsel neglected to raise claims of ineffective assistance of trial counsel and a Brady violation on direct appeal of petitioner's conviction. Respondent observes correctly that this claim is unexhausted and procedurally defaulted.

Although petitioner properly raised the ineffective assistance of appellate counsel claim in federal constitutional terms in his motion for a writ of error coram nobis presented to the Appellate Division, he did not seek leave to appeal the Second Department's denial of that motion to the Court of Appeals, which has a discretionary power of review in that context. See N.Y. Crim. Proc. Law § 450.90(1); see generally Baldwin, 541 U.S. at 29, 124 S. Ct. at 1349 (exhaustion requires presentation of claim to every appropriate state court, including a state supreme court with powers of discretionary review). Petitioner was obligated to apply for a certificate granting leave to appeal the Second Department's order denying his coram nobis motion "within thirty days after service upon [him] of a copy of the order." N.Y. Crim. Proc. Law § 460.10(5)(a). Failing that, petitioner could have sought the Court of Appeals' permission to file his application for leave to appeal as late as one year after the expiration of the 30-day

period, which could have been granted only under certain narrow circumstances. See N.Y. Crim. Proc. Law § 460.30(1) (permitting a defendant to request from the Court of Appeals a one-year extension of time to apply for leave to appeal an intermediate appellate court decision on the basis that the delay was the result of "(a) improper conduct of a public servant or improper conduct, death or disability of the defendant's attorney, or (b) inability of the defendant and his attorney to have communicated, in person or by mail, concerning whether an appeal should be taken."

Without following the established procedure for state court review of his coram nobis application, petitioner filed this habeas petition on July 8, 2005, well after the 30-day deadline to apply for leave to appeal the Second Department's April 18, 2005 denial of his coram nobis motion had passed. Nowhere in his petition or traverse is there any allegation, much less proof, of circumstances which would have rendered him eligible for a one-year grace period under § 460.30(1). Thus, it would have been futile to stay the petition so that petitioner could attempt to exhaust his ineffective assistance claim, as his state remedies were plainly foreclosed already. In any case, "this one-year time limit is inflexible." Shomo v. Maher, No. 04-cv-4149, 2005 WL 743156, at *5 (S.D.N.Y. Mar. 31, 2005) (collecting cases). Petitioner is now indisputably barred from seeking leave to appeal the Second Department's April 18, 2005 decision.

Petitioner's ineffective assistance of appellate counsel claim is therefore procedurally defaulted and precluded from habeas review "unless [ ] petitioner can either: (1) show cause for the default and actual prejudice as a result of the constitutional violation, or (2) demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'" Spence v. Superintendent, Great Meadow Corr. Facility, 219 F.3d 162, 170 (2d Cir. 2000) (quoting Coleman, 501 U.S. at 750, 111 S. Ct. at 2565). Again, neither is applicable. There is

no apparent explanation or justification for plaintiff's failure to appeal the denial of the coram

nobis motion. As he was proceeding *pro se* at this stage of the state court review process,

petitioner cannot attribute his failure to exhaust to an attorney representing him. Petitioner may

have simply been unaware that a further avenue for state court review of the claim was available

to him, but *pro se* status and ignorance of the law do not constitute cause. See Tapia-Garcia v.

United States, 53 F. Supp.2 d 370, 378 (S.D.N.Y. 1999); Neff v. United States, 971 F. Supp. 771,

774 (E.D.N.Y. 1997). Without cause, prejudice is immaterial See Stepney, 760 F.2d at 45. And

once again, there is no cognizable reason to find a fundamental miscarriage of justice, as it is not

even clear whether petitioner has declared actual innocence and any such declaration would lack

any foundation in new evidence whatsoever, given that there is no new evidence.

Procedural infirmities aside, as the Second Department found, petitioner's ineffective

assistance of appellate counsel claim utterly fails by any measure on its substance. The

Strickland standard also applies to claims of ineffective assistance by appellate counsel. See

Forbes v. United States, 574 F.3d 101, 106 (2d Cir. 2009) (holding that, to establish ineffective

assistance of appellate counsel, a petitioner must demonstrate performance that fell below an

objective level of reasonableness, and a reasonable probability that the outcome of the

proceeding would have been different if not for counsel's unprofessional errors); Aparicio, 269

F.3d at 95. To satisfy the performance prong in this context, it is not enough to argue, as

petitioner did in his coram nobis motion and does again in his habeas petition, that appellate

counsel omitted arguments from the brief that petitioner desired to include. See id.; Jones v.

Barnes, 463 U.S. 745, 754, 103 S. Ct. 3308, 3314 (1983). This principle applies with equal

strength whether the omitted argument is frivolous or nonfrivolous. "Appellate counsel does not

have a duty to raise all colorable claims on appeal; rather, counsel should use reasonable

emphasize those that present "the most promising issues for review"). In sum, there is no "constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." Id., 463 U.S. at 751, 103 S. Ct. at 3312.

Here, petitioner's appellate counsel filed an opening brief raising claims under federal and state law pertaining to the trial court's decisions to deny trial counsel's request to withdraw without petitioner's knowledge or input and to grant an overnight recess in the middle of the testimony of the only complaining witness present at trial so he could consult with the prosecutor, and filed a supplemental brief raising claims under federal and state law pertaining to the trial court's eleventh-hour dismissal of a juror who was not ill herself but had an ill child at home. These claims could all be supported with concrete evidence in the trial record. In light of the documentary proof that was available to appellate counsel and given the applicable law, it was entirely reasonable for appellate counsel to choose these points as the best possible attacks on petitioner's conviction, and it would be inappropriate for this Court to Monday-morning quarterback that exercise of professional judgment.

In any event, the arguments that petitioner faults appellate counsel for not raising on appeal are without merit and, obviously, "[f]ailure to make a meritless argument does not amount to ineffective assistance." United States v. Arena, 180 F.3d 380, 396 (2d Cir. 1999). As discussed extensively supra, petitioner's trial counsel's performance was not deficient. In fact, the record indicates that petitioner received meaningful representation in spite of his best efforts

30

to stymie it. Further, to the extent that an ineffective assistance of trial counsel point had been made on appeal, it could not have been substantiated and corroborated by the record, but would have had to rely primarily, if not exclusively, on petitioner's allegations about out-of-court interactions between himself and Corrado. The specifics of petitioner's Brady claim are not clearly outlined anywhere, but it appears that petitioner sought to claim that the prosecution committed a Brady violation by not disclosing Blanco's hesitancy to identify petitioner as a perpetrator. However, not even the prosecutor was aware of that wrinkle until Blanco took the stand at trial, so it would have been impossible to disclose that fact beforehand. If petitioner intended to reference his trial counsel's early motion for a mistrial based on the prosecution's failure to produce the "Bobby Lopez" wallet, that motion was withdrawn after the prosecutor demonstrated that the evidence had in fact been produced to the defense. Therefore, appellate counsel's decision to pursue and focus on other issues, rather than those suggested by petitioner, hardly makes appellate counsel's advocacy ineffective. Moreover, the obvious baselessness of the claims that petitioner alleges should have been made on appeal but were not signifies that petitioner cannot possibly establish the prejudice prong of Strickland, because there is not a reasonable probability that the outcome of the appeal would have been any different if the arguments in question had been advanced.

## CONCLUSION

For all of the foregoing reasons, the petition for a writ of habeas corpus is dismissed with prejudice and the writ is denied. Since petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. See 28 U.S.C. § 2253(c)(2). Additionally, the Court certifies pursuant to 28 U.S.C. § 1915(a) that any appeal from this Memorandum and Order would not be taken in good faith and therefore *in forma*

*pauperis* is denied for the purpose of any appeal. See Coppedge v. United States, 369 U.S. 438, 444-45, 82 S. Ct. 917, 920-21 (1962).

The Clerk of the Court is directed to enter judgment and to close this case.

**SO ORDERED.**

Dated: Brooklyn, New York
      September 17, 2010

ERIC N. VITALIANO
United States District Judge